Receipt number AUSFCC-11453829

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| OPPORTUNITY FINANCE NETWORK<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | No. 26-1324 C |

**COMPLAINT FOR RELIEF**

1. Plaintiff Opportunity Finance Network ("OFN") brings this action to vindicate its rights under its grant agreement with the Environmental Protection Agency ("EPA") and to recover damages resulting from EPA's unlawful breaches and uncompensated taking of property in violation of the Fifth Amendment to the U.S. Constitution.

2. In clear violation of its contractual, regulatory, and statutory obligations, without notice to OFN, EPA cut off OFN's access to its grant funds held at Citibank, N.A. ("Citibank") and then terminated OFN's grant.

3. OFN is a nonprofit organization and a national network of more than 470 Community Development Financial Institutions ("CDFIs") and mission-driven community lenders. OFN's mission is to ensure that communities underserved by mainstream finance have access to affordable, responsible financial products and services. OFN primarily serves low-income and underserved rural, urban, and Native communities across the United States. As a CDFI itself, OFN maintains certain minimum financial standards, such as maintaining minimum net asset ratios, that permit OFN to leverage capital appropriately and safely. Over 40 years, OFN has

safely managed billions of dollars in assets to deliver access to capital, and OFN provides access to affordable, responsible credit that finances community businesses, sparks job growth, and delivers sound financial returns. OFN is a proven leader in building safe and affordable housing, lowering energy costs, creating jobs, and improving water and air quality. In turn, OFN has made the United States more competitive, secure, and energy independent.

4. OFN received the relevant grant funds under the Greenhouse Gas Reduction Fund ("GGRF") established by Congress in the Inflation Reduction Act of 2022, Pub. L. No. 117-169, 136 Stat. 1818.[1] Specifically, Congress authorized EPA to provide grants to nonprofit "eligible recipient[s]" to finance "the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1).[2] Congress appropriated $26.97 billion for EPA "to make grants, on a competitive basis" and the appropriations remained available for that purpose "until September 30, 2024." *Id.* § 7434(a). EPA established three different programs to administer the GGRF: the Clean Communities Investment Accelerator ("CCIA"), the National Clean Investment Fund ("NCIF"), and Solar for All. EPA issued OFN's grant under the CCIA program.

5. The CCIA seeks to "build the capacity of community lenders" to "catalyze deployment of projects in communities all across the country." Notice of Funding Opportunity

---

[1] The facts underlying OFN's claims here overlap with the facts underlying six consolidated cases that also stem from GGRF grants. Those cases were filed in the United States District Court for the District of Columbia which ruled in favor of the plaintiff grant recipients, enjoining the grant terminations. After a panel of the D.C. Circuit vacated that injunction, the D.C. Circuit, sitting en banc, vacated the panel's decision and affirmed the preliminary injunction in full. *See Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 778 F. Supp. 3d 90 (D.D.C. Apr. 16, 2025), ("*Climate United* PI Decision") (granting preliminary injunction), *vacated*, 154 F.4th 809 (D.C. Cir. 2025), *reh'g en banc granted*, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025), *and aff'd en banc*, No. 25-5122, 2026 WL 2235002 (D.C. Cir. Aug. 4, 2026). OFN has voluntarily dismissed its case in the district court to pursue these claims here. *See Climate United*, 25-cv-698, ECF No. 116.

[2] The One Big Beautiful Bill Act ("OBBA"), Pub. L. No. 119-21, tit. VI, § 60002, 139 Stat. 154 (2025) repealed this statute, but is immaterial to the claims in this action.

("NOFO") at 4, attached as Exhibit 1. It provides financing to "hub" lenders which further fund qualifying projects to reduce greenhouse gas emissions. *Id.*

6. The CCIA program created a revolving fund for green energy projects by requiring CCIA grant recipients to "retain" returns on investments and other program income, "add[ing those returns] to funds committed to the program by EPA," and by requiring awardees to use the funds "beyond the period of performance based on close-out agreement." Ex. 1, NOFO at 58. The NOFO also advised that EPA would consider providing recipients with balance sheet capitalization through a financial agent arrangement with the U.S. Treasury. NOFO at 57 and 58. This was consistent with Congressional intent that grantees "retain, manage, recycle, and monetize all repayments and other revenue received from . . . using grant funds." 42 U.S.C. § 7434(b)(1)(C).

7. CCIA grants are used by recipients to provide capital and technical assistance to smaller community lenders working in low-income and disadvantaged communities across the United States, which, in turn, provide financing to support investments in qualifying projects undertaken by their respective lenders.

8. EPA selected OFN as a CCIA grantee on March 31, 2024. The agency announced the award in an April 2024 press release highlighting OFN's 40-year track record and recent achievements helping communities build resiliency, and ensure housing for residents while protecting against future climate impacts.[3] EPA's $2.29 billion grant to OFN was memorialized in a notice of award on August 8, 2024.[4]

---

[3] Press Release, EPA, *Biden-Harris Administration Announces $20 Billion in Grants to Mobilize Private Capital and Deliver Clean Energy and Climate Solutions to Communities Across America* (Apr. 4, 2024), https://www.epa.gov/newsreleases/biden-harris-administration-announces-20-billion-grants-mobilize-private-capital-and-0.

[4] The award was memorialized in a final grant agreement, known formally as a Notice of Award ("NOA"). The original NOA was dated August 8, 2024 (hereinafter "August NOA"), attached as

9. Since receiving its grant, OFN has diligently fulfilled its responsibilities established under the Grant Agreement.

10. On January 20, 2025, President Trump issued an Executive Order purporting to "Terminat[e] the Green New Deal" and directing that "[a]ll agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act." Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8,353 (Jan. 20, 2025). That same week, the Office of Management and Budget ("OMB") issued implementing memoranda. These actions were inapplicable to OFN's CCIA funds because the United States Treasury previously disbursed OFN's CCIA funds. There was nothing left to pause.

11. Beginning on February 12, 2025, EPA's Administrator Lee Zeldin announced EPA's intention to claw back Inflation Reduction Act funds, stating that the funds must be returned to the government immediately. Administrator Zeldin repeatedly made public statements expressing hostility to the GGRF program, lodging unsupported accusations of waste, fraud, and abuse against program recipients, including proclaiming on national television, without basis, that "the entire scheme, in my opinion, is criminal." He then announced that EPA is "not going to rest" until it has "recovered" the funds.

12. On March 4, 2025, Administrator Zeldin announced that the "money is now FROZEN." In the interim, EPA undertook dramatic behind-the-scenes efforts to cause OFN's funds to be withheld. As a result, the Chief of the Criminal Division of the D.C. U.S. Attorney's Office publicly resigned after she refused to send an illegal directive to Citibank demanding that it freeze OFN's funds.

---

Exhibit 2. The August 2024 NOA was then updated on December 12, 2024 (hereinafter "December NOA" or "Grant Agreement"), attached as Exhibit 3.

13. Eventually, however, Citibank acquiesced. EPA succeeded in cutting off OFN's funds despite unambiguous contractual language forbidding such action. OFN has not received *any* grant funds since February 26, 2025.

14. Then, on March 11, 2025, EPA issued OFN a purported Notice of Termination ("Termination Notice") that was signed by EPA's Acting Deputy Administrator W.C. McIntosh, attached as Exhibit 5. The Termination Notice stated that "effective immediately," "the Agency is terminating [the grant] awarded to Opportunity Finance Network." Ex. 5, Termination Notice at 1. EPA sent this cut-and-paste termination notice to all recipients of CCIA and NCIF grant awards. These notices contained no individualized findings or allegations, identified no contractual basis for termination, did not provide recipients with access to administrative dispute proceedings as required by 2 CFR 200.342 and 2 CFR 1500.13, and instead generically cited "substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities." *Id.* As the district court found, "EPA provided no individualized reasoning as to anything [recipients] themselves did—instead referencing generalized and unsubstantiated reasons for termination." *Climate United Fund v. Citibank N.A.*, 778 F. Supp. 3d 90, 114 (D.D.C. 2025).

15. EPA's Termination Notice violated OFN's Grant Agreement. The Grant Agreement allows EPA to terminate "***only*** as specified in 2 CFR 200.339 and the version 2 CFR 200.340 effective as of October 1, 2024." Ex. 3, December NOA at 43.[5] And under 2 C.F.R. §§ 200.339-.340, EPA can terminate for just three reasons, which could apply only if OFN engaged in any of the following misconduct: (1) substantial noncompliance with grant obligations; (2)

[5] The termination provision in the December 2024 version of the Grant Agreement is substantively identical to the earlier August 2024 version of the Grant Agreement.

material misrepresentation of eligibility status; or (3) "Waste, Fraud, or Abuse," meaning a violation of criminal-fraud, conflict-of-interest, bribery, or gratuity laws or of the civil False Claims Act. EPA did not terminate for any of these three reasons.

16. To the contrary, as the district court recognized, "nothing in the record suggests that [grantees] violated any term or condition of their agreements." *Climate United*, 778 F. Supp. 3d at 108. "Though repeatedly pressed on the issue, EPA offers no rational explanation for why it suspended the grants and then immediately terminated the entire NCIF and CCIA grant programs overnight." *Id.* at 114. Indeed, EPA *conceded* that it "did not terminate for [grantee] noncompliance" or any other "conduct of [the grantees]." Appellees' Answering Br. at 12-13, *Climate United v. Citibank*, No. 25-5122 (D.C. Cir. May 12, 2025), Doc. No. 2115501 (quoting JA503-04) ("Appellees' Br.").

17. There was also no lawful basis for EPA to cut off OFN's access to its grant funds. Consistent with the terms of the Grant Agreement, OFN's grant funds have been held at Citibank under an Account Control Agreement between Citibank, OFN, and EPA. That agreement makes clear that OFN holds legal title to its funds at Citibank. The Agreement also precludes EPA from directing Citibank to cut off OFN's access to its funds. The only exception is if EPA issues a Notice of Exclusive Control—i.e., "a written determination and finding" that one of the three grounds for termination was triggered. EPA never sent such a notice. Appellees' Br. at 51 (quoting JA1152). That is because none of the three grounds for termination existed. In fact, in multiple court proceedings, EPA admitted these events did not occur.

18. The government's unlawful actions and contractual breaches have significantly harmed and continue to harm OFN.

19. Without access to its award—which is OFN's property, in a bank account held in OFN's name—OFN cannot carry out the CCIA program's statutory public purpose or implement its initiatives to benefit the communities that would be served by OFN activities.

20. OFN cannot replace its CCIA grant funds with other funding sources. Already, OFN has been unable to award funding to subrecipients selected for projects in accordance with OFN's pre-approved workplan. It has been forced to lay off staff, reduce salaries, forego valuable funding and program income generation opportunities, and endure significant damage to its reputation.

21. Without access to its funding, OFN simply cannot undertake the work for which Congress appropriated money and EPA selected OFN in the first instance. This work is central to OFN's mission and is also instrumental to the essential work of reducing emissions of greenhouse gases and other air pollutants while building a stronger and more resilient economy in low- and moderate-income communities.

**JURISDICTION AND VENUE**

22. This Court has subject matter jurisdiction pursuant to the Tucker Act, 28 U.S.C. § 1491, which provides that "[t]he United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1).

23. OFN brings claims for monetary damages over $10,000 against the United States founded upon the government's violations of an express contract and/or an implied-in-fact contract with the United States, a money-mandating Act of Congress, a money-mandating

regulation of an executive department, and a taking of OFN's property in violation of the Fifth Amendment of the Constitution.

24. Venue is proper in this Court pursuant to 28 U.S.C. § 1491 because the claim is for more than $10,000 against the United States, and the actions at issue were conducted on behalf of Defendant United States within the District of Columbia. *U.S. Marine, Inc. v. United States*, 722 F.2d 1360, 1366 (Fed. Cir. 2013).

## PARTIES

25. Opportunity Finance Network is a nonprofit organization incorporated in the Commonwealth of Pennsylvania with offices in Philadelphia and Washington, D.C. OFN is a leading national network of more than 470 Community Development Financial Institutions and mission-driven community lenders nationwide, and a financial intermediary whose mission is to increase capital flow, strengthen CDFIs, and amplify the voice of the CDFI industry. OFN works to ensure communities underserved by mainstream finance have access to affordable, responsible financial products and services.

26. Defendant is the United States, acting through its various agencies and personnel, including, but not limited to, the Environmental Protection Agency and EPA Administrator Lee Zeldin. EPA is responsible for administering the GGRF and its constituent CCIA program. EPA entered into the Grant Agreement and Account Control Agreement with OFN. Administrator Zeldin is the agency's highest-ranking official.

## BACKGROUND

### A. Congress Establishes the CCIA Program.

27. In 2022, Congress passed and President Biden signed into law the Inflation Reduction Act. Pub. L. No. 117-169, 136 Stat. 1818. The Act amended the Clean Air Act to

authorize EPA to make competitive grants under the Greenhouse Gas Reduction Fund. These grants provide financial assistance for "the rapid deployment of low- and zero-emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). In total, the Inflation Reduction Act appropriated $27 billion to invest in clean energy in communities across the county. *Greenhouse Gas Reduction Fund*, EPA, https://www.epa.gov/greenhouse-gas-reduction-fund/about-greenhouse-gas-reduction-fund (last updated Sept. 30, 2025).

28. The statute created this new program to leverage public funds with private capital and catalyze investment into places and projects that support local economic development.

29. Section 134(a)(3) of the Act appropriated to the EPA Administrator $8 billion to "make grants, on a competitive basis …, to eligible recipients for the purposes of providing financial assistance and technical assistance in low-income and disadvantaged communities in accordance with subsection (b)." *Id.* § 7434(a)(3).

30. In turn, subsection (b) provides that an eligible recipient shall use the grant in accordance with the following: (1) facilitating "financial assistance to qualified projects at the national, regional, State, and local levels"; (2) prioritizing "investment in qualified projects that would otherwise lack access to financing"; (3) "retain[ing], manag[ing], recycl[ing], and monetiz[ing] all repayments and other revenue received from fees, interest, repaid loans, and all other types of financial assistance provided using grant funds under this section to ensure continued operability"; and (4) providing "funding and technical assistance to establish new or support existing public, quasi-public, not-for-profit, or nonprofit entities that provide financial assistance to qualified projects." *Id.* § 7434(b).

31. Qualified projects are defined to include any "project, activity, or technology" that either "reduces or avoids greenhouse gas emissions and other forms of air pollution in partnership

with, and by leveraging investment from, the private sector," or "assists communities in the efforts of those communities to reduce or avoid greenhouse gas emissions and other forms of air pollution." *Id.* § 7434(c)(3).

32. In July 2023, EPA launched three grant competitions: CCIA, NCIF, and Solar for All. As described in EPA's original Notice of Funding Opportunity ("NOFO"), the $6 billion CCIA competition focused entirely on "financ[ing] clean technology deployment in low-income and disadvantaged communities while simultaneously building the capacity of community lenders that serve those communities." Ex. 1, NOFO at 3.

33. The purpose of the CCIA competition was to provide grants to between two and seven hub nonprofits. These recipients, in turn, provide financing and technical assistance to specific industry networks of public, quasi-public, and nonprofit community lenders, supporting the goal that every community in the country have access to the capital needed to deploy clean technology projects in their homes, small businesses, schools, and community institutions. Ex. 1, NOFO at 4.

34. EPA structured the CCIA program to continue beyond the grant's period of performance, and EPA required recipients to retain program income generated by investments and other activities and to continue using those funds for green energy projects into the future. Ex. 1, NOFO at 20, 58.

35. The Inflation Reduction Act provided that the EPA Administrator could award grants "on a competitive basis" with appropriations that remained available for obligation until September 30, 2024. 42 U.S.C. § 7434(a)(1)-(3).

**B. EPA Awards OFN CCIA Grant Funding.**

36. On July 14, 2023, EPA issued a NOFO for the CCIA. The NOFO included a robust set of application requirements and corresponding evaluation criteria that were used to assess materials submitted to meet those application requirements.[6] "Application requirements covered a diverse set of topics and included a detailed project narrative and a robust set of application attachments," such as "organizational and governing documents; resumes of board members and senior management; legal and compliance risk management policies and procedures; financial statements; workplans for the first year of program implementations, and budget narratives."[7]

37. EPA established a rigorous process to review and select grant recipients. That process included an evaluation of each applicant's program plan, organizational capacity, previous experience managing third-party capital, and experience managing financial, credit, compliance, and other risks. The review was conducted by expert panels with broad and deep qualifications who would then present rankings and recommendations to a Selection Official authorized to make the final selection for grant awards. Ex. 1, NOFO at 55.

38. On October 10, 2023, OFN applied to the CCIA grant competition with a $3.2 billion proposal. As part of the application process, OFN was required to submit a detailed budget. Additionally, before receiving the Notice of Award, OFN was required to attach a negotiated, thoroughly reviewed, and approved budget to its Grant Agreement with EPA.

39. OFN was abundantly qualified to receive the CCIA grant. OFN was formed more than 40 years ago to empower mission-driven community lenders. Its mission is to ensure that

---

[6] *See also Greenhouse Gas Reduction Fund, Review and Selection Process*, EPA (last updated Aug. 16, 2024), https://web.archive.org/web/20240519153319/https:/www.epa.gov/greenhouse-gas-reduction-fund/review-and-selection-process.
[7] *Id.*

communities underserved by mainstream finance have access to affordable, responsible financial products and services, and to carry out Congress' directive to invest in communities to create jobs and protect the environment. Consistent with this mission, OFN sought the grant to finance projects in housing, transportation, energy infrastructure, and other initiatives across the United States.

40. After completing its rigorous review process, EPA awarded OFN $2.29 billion in CCIA grant funding and agreed to fund 100% of OFN's approved costs over the Project period lasting through June 2030. Ex. 2, August NOA at 1, 3.

41. Consistent with the purpose of the Inflation Reduction Act under which the CCIA funds were appropriated, OFN developed and EPA approved a workplan that was finalized with the award and posted publicly for full transparency. As enumerated in the workplan, OFN planned to obligate at least $207 million in subawards in the first year of funding (*i.e.*, before July 2025) that would be invested in qualified projects, and planned to deploy the full amount of the grant over the first six years of the program.

### C. Contractual and Legal Framework Governing Suspension or Termination of the Grant Agreement.

42. The Grant Agreement—also called a Notice of Award or NOA—is the contract that governs the award.

43. From the beginning, EPA envisioned entering into initial NOAs with recipients in the summer of 2024 and amending those NOAs with recipients in the fall and winter, revising the Terms and Conditions as needed to more effectively carry out program objectives. That is precisely what happened here. As the NOFO noted, "[a]fter an applicant is selected for award, EPA staff (Project Officer, Grant Specialist, and Financial Specialist) will discuss departures from the EPA General Terms and Conditions with each selected awardee" for example to include working capital

and annual advances, or one-time or periodic balance-sheet capitalizations subject to protections for the government that may include use of "financial agent arrangements" such as the one in place between OFN, Citibank and EPA. Ex. 1, NOFO at 57-58.

**a. August NOA**

44. The initial Grant Agreement between OFN and EPA was dated August 8, 2024 ("August NOA"). The August NOA imposed extensive and detailed General, Administrative, and Programmatic terms and conditions on OFN's use of its grant funds, and it was "subject to applicable EPA regulatory and statutory provisions, all terms and conditions of this agreement and any attachments." Ex. 2, August NOA at 1.

45. Relevant here, the August NOA narrowed EPA's ability to suspend or terminate the grant or prevent OFN from accessing its funds. As explained *infra*, these conditions are materially identical to the termination provisions under the currently operative December NOA given that the termination provision of the Programmatic Terms and Conditions overrode the termination provision of the General Terms and Conditions based on EPA's adoption of the revised version of 2 CFR 200.340 effective July 3, 2024.

46. The August NOA set out three (and only three) scenarios in which EPA can suspend or terminate OFN's grant. Ex. 2, August NOA at 41-42.

a. *First*, EPA may terminate the Grant Agreement if OFN engages in "substantial" noncompliance such that "effective performance" of the agreement is "[M]aterially [I]mpaired." *Id.* at 42.

b. *Second*, EPA may terminate the Grant Agreement if OFN engages in "material misrepresentation of eligibility status." *Id.*

c. *Third*, EPA may terminate the Grant Agreement if OFN commits "waste, fraud[] … or abuse, prompting adverse action by EPA per 2 CFR 200.339." *Id.*

47. In addition, EPA is obligated by regulation to take certain procedural steps to terminate the Grant Agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a); Ex. 2, August NOA at 41-42 (incorporating this regulatory requirement into the Terms and Conditions of the Agreement).

**b. December NOA**

48. As contemplated from the outset and agreed to by the parties, the August NOA was replaced by the December NOA, which became effective on December 20, 2024. Ex. 3, December NOA at 1. The December NOA contains the operative provisions, including the applicable requirements for termination.[8]

49. The December NOA contains certain changes, including updates to compliance with the Davis-Bacon Act, *id.* at 30 (enumerating Davis-Bacon Act exemptions), and the Build America, Buy America Act, *id.* at 34-36 (enumerating projects subject to statutory requirements). To increase visibility into grant funds, and as contemplated in the NOFO (Ex. 1, NOFO at 58), the December NOA also incorporates the Financial Agent Agreement, permitting Citibank's systems to handle financial operations and facilitate oversight rather than Treasury's less-transparent Automated Standard Application for Payment ("ASAP") system. Ex. 3, December NOA at 57-58. Accordingly, the December NOA omits provisions related to the ASAP system that applied before

[8] The December NOA likewise did not alter the award or the underlying reporting and transparency requirements of the August NOA. *Compare* Ex. 2, August NOA, *with* Ex. 3, December NOA.

the parties entered into the ACA with Citibank. *Compare* Ex. 2, August NOA at 53-55 (outlining "Interim Drawdown Procedures"), *with* Ex. 3, December NOA at 54 (omitting procedures).

50. The December NOA also sets out three (and only three) conditions under which EPA may terminate OFN's grant:

a. *First*, EPA may terminate the Grant Agreement if OFN engages in "substantial" noncompliance such that "effective performance" is "Materially Impaired." Ex. 3, December NOA at 43. The December NOA defines "Materially Impaired." *Id.* Effective performance is "Materially Impaired" if (1) EPA issues a "written determination and finding … that the Recipient has failed to achieve sufficient progress in accordance with the Sufficient Progress clause," and (2) if EPA determines in its sole discretion that a "corrective action plan" would remedy the issue, EPA must issue a "separate written determination and finding" that the Recipient "has not materially addressed its failure." *Id.* at 9-10.

b. *Second*, EPA may terminate the Grant Agreement if OFN engages in "material misrepresentation of eligibility status." *Id.* at 43.

c. *Third*, EPA may terminate the Grant Agreement if OFN engages in "Waste, Fraud, or Abuse," *id.*, which is defined with reference to the EPA General Terms and Conditions and 2 C.F.R. § 200.113, *id.* at 14. Those sources require "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act (31 U.S.C. [§§] 3729-3733)." *See* EPA, *General Terms and Conditions* at 42 (effective Oct. 1, 2024), https://www.epa.gov/system/files/documents/2024-

10/fy_2025_epa_general_terms_and_conditions_effective_october_1_2024_or_later.pdf; 2 C.F.R. § 200.113.

51. Under the December NOA, EPA is obligated by regulation to take certain procedural steps to terminate the Grant Agreement. Among other things, EPA must comply with 2 C.F.R. § 200.341, which requires EPA to provide written notice of termination to the recipient that includes "the reasons for termination, the effective date, and the portion of the Federal award to be terminated, if applicable." 2 C.F.R. § 200.341(a); Ex. 3, December NOA at 43 (incorporating this regulatory requirement into the Terms and Conditions).

**D. OFN Has Legal Title to Its Grant Funds and Is Entitled to Them at Closeout.**

52. "[I]ncentivizing private sector development and investment" in clean energy and efficiency was a key goal of the Inflation Reduction Act. H.R. Rep. No. 117-130(I), at 5 (2021). To accomplish this goal, Congress structured the GGRF to leverage private sector investment.

53. The text of the statute confirms this. "Eligible recipients" for grant funding are defined as nonprofit organizations that are "designed to provide capital, leverage private capital, and provide other forms of financial assistance for the rapid deployment of low-and zero emission products, technologies, and services." 42 U.S.C. § 7434(c)(1). "Qualified project[s]" are defined as projects that "reduce[] or avoid[] greenhouse gas emissions and other forms of air pollution in partnership with, and by leveraging investment from, the private sector." *Id.* § 7434(c)(3). Congress ultimately sought to "capitalize" community-lender subrecipients through the GGRF and "use that capitalization funding to leverage private investment in amounts several times greater than the initial public investment." 168 Cong. Rec. H7702 (daily ed. Aug. 12, 2022) (statement of Rep. Dingell).

54. While most federal grant programs employ a reimbursement structure that does not enable private leverage, *see* Natalie Paris, Cong. Rsch. Serv., IF12924, *Understanding Federal Agency Grant Disbursement, Payment, Processes, and "Freezes"* 2 (2025), Congress in the GGRF sought to provide at the outset "[s]wift disbursement of the maximum funding amount possible" to allow recipient to "leverage more private financing—thereby ensuring [that] public investment has a far-reaching impact." 168 Cong. Rec. H7702. Accordingly, Congress required grantees to "retain, manage, recycle, and monetize all repayments and other revenue received from … using grant funds." 42 U.S.C. § 7434(b)(1)(C).

55. As indicated in Section V, "Financial Agent Terms and Conditions," of the August 2024 NOA, EPA determined that Congressional goals for the GGRF program could best be accomplished if the obligated funds awarded to grantees were provided to the grantees directly and reflected as unencumbered capital on grantees' balance sheets. The Agency understood that awardees' ability to obtain financing, enter into stable and favorable agreements with subrecipients, and otherwise carry out the program objectives depended in part on whether the awardees had access to unencumbered capital. In furtherance of this policy decision, the U.S. Treasury selected Citibank as the financial agent for the GGRA program. Awardees, including OFN, created bank accounts in their own names at Citibank.

56. As soon as the funds were deposited in OFN's account at Citibank, legal title passed to OFN for its use in furtherance of Congress's directives, including to reinvest and redeploy. 42 U.S.C. § 7434(b).

57. The Grant Agreement confirms OFN's ownership of its funds held at Citibank. It categorizes the disbursement of OFN's grant funds as "Capitalization by Nonexchange Capital Contribution"—i.e., a transfer to OFN—and as a type of "program income" for OFN. Ex. 3,

December NOA at 11-12 (defining "Program Income"); *id*. at 55-56 (describing recipients' use of Program Income).[9]

58. Under the Grant Agreement, OFN's funds must remain in the Citibank account for the duration of OFN's "Period of Performance." "The Period of Performance … will end on the date specified in the Notice of Award. However, the Period of Performance may end prior to [that] date … if all required work of the Federal award has been completed, in accordance with 2 CFR 300.344." Ex. 3, December NOA at 43.

59. The Grant Agreement then contemplates a "self-executing" process, the "Closeout Agreement," that governs the closing of the grant.

60. The termination event triggers closeout. As EPA confirmed in an October 1, 2025, email to recipients of the Greenhouse Gas Reduction Fund's Solar For All program with the subject line "Solar for All Grant Closeout Instructions," a "notice of termination" "immediately end[s] [the] award's performance period and put[s] into effect the Closeout Agreement Programmatic Term and Condition."

61. Pursuant to that Closeout Agreement, OFN is entitled to transfer its funds held at Citibank to any financial institution of its choosing. The Closeout Agreement further contemplates that after the Period of Performance, "the Recipient [OFN] may keep and use Program Income [including the funds at Citibank] in accordance with this term and condition." Ex. 2, August NOA at 42; Ex. 3, December NOA at 43-44 (referring to the closeout provisions). *See id*. at 11-12 (defining OFN's funds as "Program Income"); *id*. at 22-23 (describing recipients' use of Program Income).

[9] Program Income is defined to include the entirety of the award deposited at Citibank. "The full amount of the Capitalization by Nonexchange Capital Contribution must be recognized, reported, and accounted for as program income." Ex. 2, August NOA at 56; Ex. 3, December NOA at 55.

**E. The Account Control Agreement (ACA) Between OFN, EPA, and Citibank.**

62. As required by the Grant Agreement, on November 1, 2024, OFN, EPA, and Citibank entered into the Account Control Agreement ("ACA"), attached as Exhibit 4. The ACA further confirms that the grant funds belong to OFN.

63. Under the ACA, EPA deposits OFN's grant funds into an account at Citibank in OFN's name, controlled by OFN, under which OFN may seek distribution of its funds to carry out its obligations under the Grant Agreement. Ex. 4, ACA at 1 ("The Bank maintains the Accounts for [OFN], and all property (including, without limitation, all funds and financial assets) held by the Bank for the accounts of [OFN] are, and will continue to be, credited to the Accounts in accordance with instructions given by [OFN]."). Under the ACA, Citibank merely "maintains the Accounts for [OFN]," and OFN is the "entitlement holder with respect to all financial assets" in the account. *Id.*

64. Under the ACA, Citibank administers the funds provided under the CCIA, in its role "as a financial agent of the United States pursuant to the authority" of the U.S. Treasury Department ("Treasury"), and EPA serves as the "Secured Party." *Id*. The ACA provides that EPA has perfected only a "security interest" in OFN's funds—an interest OFN granted EPA. *Id.* at 2. And because EPA holds a security interest in OFN's grant funds, it does not, and cannot, own them. *Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 262-63 (1999) (explaining that party's security interest in property "does not give the [party]" that property (internal quotation marks omitted)); *Ordnance Devices, Inc. v. United States*, 50 F.3d 22, 1995 WL 131498, at *2 (Fed. Cir. 1995) (unpublished table decision) (distinguishing between government ownership of property and possession of a "mere[] security interest" in that property).

65. Citibank's role under the ACA is limited. "[T]he duties, responsibilities and obligations of the Bank shall be limited to those expressly set forth in this Agreement, each of which is administrative or ministerial." Ex. 4, ACA at 3.

66. The ACA requires Citibank to distribute OFN's funds upon OFN's request. ACA § 2 provides that Citibank "shall comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets in the Accounts including, without limitation, directions to distribute proceeds of any such transfer or redemption of interest or dividends on financial assets in the Accounts . . . originated by [OFN]." Ex. 4, ACA at 2.

67. There is only one exception; Citibank can only refuse OFN's request to distribute its grant funds if EPA properly exercises EPA's security interest in OFN's grant funds. *See* Ex. 4, ACA at 1 (only providing EPA with a "security interest in the accounts"). The ACA provides a specific process for EPA to exercise its security interest in OFN's funds—that is, it must exercise its "right of control" under the ACA. *Id*.

68. To exercise its right of control, EPA must notify Citibank of its intention to exercise exclusive control over the accounts, in a form substantially similar to a sample Notice of Exclusive Control contained in the ACA. *Id*. at 2; *see also id.* at 1 (stating that OFN and EPA "have agreed that the terms and conditions entitled 'Deposit Account at Financial Agent' in the Grant Agreement indicate the conditions under which the [EPA] may exercise its right of control").

69. The form Notice of Exclusive Control states: "As required by the Grant Agreement, the Secured Party [*i.e.*, EPA] has issued a written determination and finding that Pledgor [*i.e.*, OFN] has failed to comply with the terms and conditions of the Grant Agreement, and that noncompliance is substantial such that effective performance of the Grant Agreement is materially impaired or there is adequate evidence of waste, fraud, material misrepresentation of eligibility

status, or abuse, and that the Secured Party has initiated action under 2 CFR 200.339 to wholly or partly suspend or terminate the Grant Agreement, as authorized in the terms of the Grant Agreement." *Id*. at 10.

70. The form Notice of Exclusive Control thus incorporates the standard for termination of the grant specified under the Grant Agreement. *Compare id.*, *with* Ex. 2, August NOA at 41–42 (discussing termination under the "Clarifications to EPA General Terms and Conditions" header) and Ex. 3, December NOA at 57-58 (discussing termination under the "Additional Programmatic Terms and Conditions" header).

**F. The Financial Agency Agreement Between Citibank and Treasury.**

71. As contemplated in the NOFO and to provide access to the grant funds, the Treasury entered into a Financial Agency Agreement ("FAA") with Citibank on September 19, 2024. *See* FAA, attached as Exhibit 6; Ex. 1, NOFO at 58.

72. Citibank has a limited role under the FAA. The FAA provides that Citibank will "act only within the scope of its actual authority and … comply with all lawful instructions or directions received from Treasury." Ex. 6, FAA at 3.

73. The FAA, like the ACA, confirms that the accounts are in grant recipients' names while EPA acts only as a secured party.

74. The FAA authorizes EPA to instruct Citibank to "freeze accounts, and transfer funds in frozen accounts, at [EPA's] direction." *Id*. at A-4. But the FAA specifies that any such action must be "in accordance with the account control agreements [ACAs]" between EPA, OFN, and Treasury. *Id*. Thus, nothing in the FAA authorizes EPA or Citibank to freeze, claw back, or otherwise interfere with OFN's access to its money *unless* EPA issues a valid "Notice of Exclusive Control" under the ACA.

75. Under the FAA, EPA had full access to and visibility of how OFN used its grant funds. For example, the FAA grants EPA real-time visibility into, among other things, OFN's withdrawals, transfers, balance sheets, and investments. EPA also has full visibility into any additional program income OFN generates, which is typically opaque.

76. For example, from August 2024 (when the August NOA was finalized) until November 2024 (when the ACA was finalized), OFN's grant was administered under the Treasury Department's ASAP system. After that point, it was administered under the FAA with Citibank. EPA has traditionally used the ASAP system to disburse grant funds. Under the ASAP system, Treasury cannot conduct similarly rigorous oversight—it simply reports to EPA the amounts that have been drawn by the recipient and what amounts remain. *See* Gov't Accountability Off., GAO-17-176, *Revenue Collections and Payments: Treasury Has Used Financial Agents In Evolving Ways but Could Improve Transparency* (Jan. 2017), https://www.gao.gov/assets/gao-17-176.pdf ("Treasury has a long history of using financial agents to support its core functions of disbursing payments and collecting revenue.").

**G. OFN Uses Grant Funds Consistent With the Terms of the Grant Agreement.**

77. EPA fully obligated OFN's CCIA funds on August 8, 2024.

78. OFN has drawn grant money to pay operating expenses, as permitted by the governing Terms and Conditions (and underlying statutes and regulations), which requires prior approval for drawing of transfers that will not be disbursed within fifteen business days. *See* Ex. 3, December NOA at 59-60.

79. OFN has used grant funds for eligible payments to service providers hired consistent with the grant's provisions, and for the salaries and benefits for 42 employees on its payroll.

80. Thus far, OFN has launched a pilot "Nascent Climate Lender Training" program to build its pipeline of qualified CDFI lenders, and it has already engaged in months-long trainings with 36 lenders. As explained, OFN approved awards to 26 community lenders. The announcement of over $228 million in initial awards to finance housing, distributed energy, and develop transportation infrastructure projects in more than 30 states, creating or retaining an estimated 5,000 jobs in communities across the United States, has been paused due to EPA's breaches and other illegal conduct.

81. OFN has also complied with EPA's requirement, emailed to OFN on March 24, 2025, by Ms. Aileen Nowlan, that EPA "does expect OFN to continue meeting the obligations under the Grant Agreement" even though EPA blocked OFN's access to its grant funds. OFN continued to perform its grant obligations notwithstanding EPA's termination of OFN's grant, including by submitting required reports and updates to EPA. EPA ceased responding substantively to these reports in April 2025.

### H. EPA Cuts Off OFN's Access to its Funds and Terminates the Grant Agreement.

82. On January 20, 2025, President Trump issued an Executive Order, "Unleashing American Energy," that purported to "[t]erminat[e] the Green New Deal."[10] It stated: "All agencies shall immediately pause the disbursement of funds appropriated through the Inflation Reduction Act of 2022."[11]

83. On January 30, 2025, Administrator Zeldin was sworn in as the EPA Administrator.

[10] Exec. Order 14154, *Unleashing American Energy*, 90 Fed. Reg. 8,353 (Jan. 20, 2025), https://www.whitehouse.gov/presidential-actions/2025/01/unleashing-american-energy/.
[11] *Id*. § 7.

84. On February 12, 2025, Administrator Zeldin publicly announced EPA's goal of taking possession of grant funds disbursed pursuant to the Inflation Reduction Act.[12] Without citing a basis for adverse action under the terms of OFN's Grant Agreement, or that of any other recipient, Administrator Zeldin stated that "the financial agent agreement with the Bank needs to be instantly terminated," and stated that "the Bank must immediately return" the grant funds.[13] To justify those actions, Administrator Zeldin repeatedly lodged baseless and vague accusations about waste, fraud, and abuse among grant recipients—accusations EPA repeatedly failed to substantiate in court. Memorandum Opinion at 17, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (D.D.C. Mar. 12, 2025), ECF No. 28 ("TRO Memorandum Opinion") (finding EPA offered no evidence of waste, fraud, or abuse among NCIF or CCIA grantees, and instead gave "circular" responses to the court). Nonetheless, EPA proclaimed it is "not going to rest" until it "recover[s]" the grant funds.[14]

85. EPA thereafter took multiple actions designed to suspend or terminate OFN's Grant Agreement and cut off OFN's access to its grant funds. Those actions include, but are not limited to:

a. On February 17, 2025, the Office of the Deputy Attorney General ("ODAG") at the Department of Justice communicated with the United States Attorney's Office in Washington, D.C. ("USAO-DC"), seeking to open a grand jury investigation into

---

[12] Lee Zeldin (@EPALeeZeldin), X (Feb. 12, 2025, 7:52 PM), https://x.com/epaleezeldin/status/1889840040622321778.
[13] *Id*. at 2:15.
[14] Rapid Response 47 (@RapidResponse47), X (Feb. 25, 2025, 10:16 AM), https://x.com/RapidResponse47/status/1894406216052289869.

EPA's GGRF grants.[15] Denise Cheung, the Chief of the Criminal Division at USAO-DC, advised there was not an adequate factual basis to open that grand jury investigation.[16]

b. On February 17, 2025—despite Ms. Cheung's determination there was insufficient evidence to seize OFN's funds—FBI instructed Citibank to freeze OFN's assets.[17] Without any factual support, FBI cited so-called "credible information" that OFN's and others' accounts were "involved in possible criminal violations." FBI did not back up these claims with a warrant issued by a judge who found probable cause based on a sworn affidavit. Nor did FBI articulate any exigent circumstances to justify an immediate seizure of OFN's assets without notice to OFN.[18]

c. That same day, ODAG instructed the USAO-DC to direct Citibank to freeze OFN's assets and refrain from releasing funds in the accounts of 28 other GGRF awardees and subawardees pursuant to a criminal investigation.[19] In response, senior officials at the DC-USAO again asserted that there was not sufficient evidence to justify the

[15] *Read the Resignation Letter by Denise Cheung, a Veteran D.C. Federal Prosecutor*, Wash. Post (Feb. 18, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/18/read-resignation-letter-denise-cheung/ ("*Resignation Letter*"); *see also* Kyle Cheney et al., *Senior Prosecutor in Washington Quits, Citing Pressure to Probe Biden-era Climate Funds*, Politico (Feb. 18, 2025), https://www.politico.com/news/2025/02/18/denise-cheung-us-attorneys-office-washington-020363.

[16] *Resignation Letter*, *supra* note 15 (noting assessment that no "predicate for opening such a grand jury investigation existed" on the face of the existing documents provided by ODAG).

[17] *See* Exhibit 5 to Citibank's TRO Opposition, *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (D.D.C. Mar. 12, 2025), ECF No. 14-5.

[18] *Resignation Letter*, *supra* note 15.

[19] *Id*.

asset freeze.[20] Consistent with her oath of office, Ms. Cheung refused to send Citibank the instruction and was forced to resign on February 18, 2025.[21]

d. Apparently without signoff from other prosecutors at the DC-USAO, Interim U.S. Attorney Ed Martin submitted a seizure warrant application to a magistrate judge, which was rejected.[22] After that, ODAG reportedly sought a *different* U.S. attorney's office to carry out the warrant request in order to launch a grand jury investigation and obtain a court-ordered bank freeze, but prosecutors in that office likewise refused to do so.[23]

e. On February 19, 2025, Administrator Zeldin stated on X that he had "just read" a "grant agreement" related to the GGRF, characterizing it as "wild."[24]

f. On February 22, 2025, and at other times thereafter, Administrator Zeldin has stated that he has cancelled several grant agreements, apparently unilaterally, regarding climate and the environment.[25]

---

[20] *Id.*

[21] *Id.*

[22] Spencer Hsu, Maxine Joselow & Nicolas Rivero, *FBI Takes Up EPA Probe Amid Pushback from Judge, Prosecutors*, Wash. Post (Feb. 27, 2025), https://www.washingtonpost.com/dc-md-va/2025/02/27/trump-fbi-epa-grant-investigation/.

[23] *Id.*

[24] Lee Zeldin (@EPALeeZeldin), X (Feb. 19, 2025, 4:01 PM), https://x.com/epaleezeldin/status/1892318587961930086.

[25] Lee Zeldin (@EPALeeZeldin), X (Feb. 22, 2025, 2:10 PM), https://x.com/epaleezeldin/status/1893377875220332772 (proclaiming EPA has "cancelled" various "DEI and Environmental Justice grants [and contracts]"); *see also* Lee Zeldin (@EPALeeZeldin), X (Feb. 28, 2025, 5:40 PM), https://x.com/epaleezeldin/status/1895604975860125829.

g. On February 23, 2025, Administrator Zeldin discussed the GGRF program on national television and stated, without basis, that "the entire scheme, in my opinion, is criminal."[26]

h. On March 4, 2025, Treasury directed Citibank not to distribute funds from any of the GGRF accounts for a specified period. Specifically: "Treasury [instructed] Citibank, in its capacity as fiduciary, to work directly with the EPA to establish and implement reasonable account controls to serve the purposes and interests of the United States, in accordance with Section 5 of the FAA. Further, in order to provide the EPA with the necessary time to develop reasonable account controls, we are further instructing Citibank not to disburse funds from any of the GGRF accounts prior to the end of the day Sunday, March 9, 2025."[27]

i. On March 4, 2025, Administrator Zeldin stated: "The money is now FROZEN and DOJ/FBI is investigating."[28]

j. On March 10, 2025, EPA directed Citibank to continue to refrain from processing payments: "EPA instructs the Bank, pursuant to this Treasury directive, the grant agreements, and Section I.B of Exhibit A to the [FAA], to pause the processing of payment instructions for the GGRF accounts until further notice."[29]

---

[26] Sunday Morning Futures (@SundayFutures), X (Feb. 23, 2025, 11:21 AM), https://x.com/SundayFutures/status/1893697750937505807; *see also* Zack Colman, *Recipient Isn't Giving in as Trump's EPA Tries to Revoke Climate Grants*, Politico (Feb. 24, 2025) (collecting quotes), https://www.politico.com/news/2025/02/24/climate-grant-recipient-spending-trumps-epa-tries-claw-back-00205814.

[27] *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (D.D.C. Mar. 12, 2025), ECF No. 14-7 (Exhibit 7 to Citibank's opposition to Plaintiff's Motion for a TRO).

[28] Lee Zeldin (@EPALeeZeldin), X (Mar. 4, 2025, 6:02 PM), https://x.com/epaleezeldin/status/1897060177784004921.

[29] *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (D.D.C. Mar. 12, 2025), ECF No. 14-2 (Exhibit 2 to Citibank's opposition to Plaintiff's Motion for a TRO).

86. EPA's actions have blocked OFN's access to its funds—funds to which OFN is entitled pursuant to requests governed by the ACA.

a. On February 26, 2025, OFN placed a request to transfer funds between its accounts. That request was not honored.

b. On February 28, 2025, OFN inquired about the transfer. Again, the request was not honored.

c. On March 3, 2025, OFN requested funds from its account, but again, the request was not honored. In response, Citibank instructed OFN to "continue to reach out to the EPA."

d. On March 4, 2025, a Citibank spokesperson stated that its "role as [a] financial agent does not involve any discretion," and "Citi will of course comply with any binding instructions from the federal government."[30]

87. To date, OFN has not received access to its CCIA grant funds.

88. EPA failed to explain its rationale for directing OFN's funds to be frozen. EPA also failed to give OFN an opportunity to cure any purported noncompliance with the Grant Agreement.

a. Consistent with the terms of the Grant Agreement, OFN repeatedly contacted EPA in an effort to understand EPA's concerns. On February 14, 2025, OFN sent a letter to Administrator Zeldin requesting a meeting to discuss OFN's work and its grant, and OFN followed up on its request on February 25, 2025. EPA did not respond.

b. Instead, on March 11, 2025, EPA issued a cookie-cutter Termination Notice to OFN, along with all other GGRF grantees. It contained no information specific to

[30] Jeff Young, *Green Group Wants EPA to Explain Why $20 Billion Accounts Are Frozen*, Newsweek (Mar. 4, 2025), https://www.newsweek.com/climate-united-fund-epa-letter-frozen-bank-accounts-2039608.

OFN's performance under the Grant Agreement and was materially identical to the termination notices sent to other grantees.

c. On March 24, 2025, EPA notified OFN that EPA "does expect OFN to continue meeting the obligations under the Grant Agreement" even though EPA blocked OFN's access to its grant funds. Ms. Nowlan stated "[w]e have no information about accessibility of funds."

d. On March 28, 2025, OFN emailed Deputy Administrator McIntosh requesting a meeting to discuss the grant award. Again, EPA did not respond.

e. On April 10, 2025, to preserve its rights and without conceding the validity of EPA's Termination Notice, OFN emailed a notice to Deputy Administrator McIntosh and their Program Officer challenging and appealing any termination of their CCIA grant. OFN was not afforded a decision on this appeal by an EPA Dispute Decision Official as required by 2 CFR 200.342 and 2 CFR 1500, Subpart E.

f. Indeed, EPA has since confirmed that it "did not terminate for [grant recipient] noncompliance" or any other "conduct" of grant recipients, which includes OFN. Appellees' Br. at 12-13 (quoting JA503-04).

**I. EPA's Unlawful and Baseless Termination Notice.**

89. EPA's March 11, 2025 Termination Notice is unlawful and violated the Grant Agreement. As with the termination notices sent to similarly situated grantees, the Termination Notice provided no individualized reasoning as to any conduct by OFN warranting the termination. *See Climate United*, 778 F. Supp. 3d at 114.

90. The Termination Notice states that EPA is terminating OFN's grant "[p]ursuant to [EPA's] authority under 2 C.F.R. §[ ] 200.339." Ex. 5, Termination Notice at 1. That regulation only applies when a grant recipient "fails to comply with the U.S. Constitution, Federal statutes, regulations, or terms and conditions of the Federal award." But EPA's Termination Notice offers no explanation as to how OFN violated any constitutional provision, federal statute, regulation, term, or condition of the Grant Agreement, let alone provide any evidence that might substantiate such an allegation.

91. The Termination Notice also states that EPA is terminating OFN's grant pursuant to EPA's authority under "C.F.R. §§ 200.339-40." Ex. 5, Termination Notice at 1. That regulation is the only termination authority mentioned in EPA's General Terms and Conditions for grants, and it permits termination if the recipient "fails to comply with the terms and conditions of the Federal award" or "pursuant to the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(1) and (4). EPA's Termination Notice does not explain how OFN failed to comply with any Terms and Conditions of its grant or offer any evidence that might substantiate such an allegation.

92. The Termination Notice also states that EPA is terminating OFN's grant "[p]ursuant to [EPA's] authority under … the terms and conditions of the Grant Agreement." Ex. 5, Termination Notice at 1. The Grant Agreement specifies that termination may only occur if one of three conditions is met: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." Ex. 3, December NOA at 14, 43. EPA's

Termination Notice does not say which of these conditions has been met, provide any explanation as to how OFN has violated the terms or conditions of the grant, or offer any evidence to substantiate any allegation.

93. The Termination Notice also states that EPA is terminating OFN's grant "[p]ursuant to … the Agency's inherent authority to reconsider prior determinations in light of new information." Ex. 5, Termination Notice at 1. EPA's Termination Notice does not identify the source of such inherent authority or any new information to support reconsidering the prior determination to award the grant to OFN less than one year ago.

94. The Termination Notice also states that the "termination is based on substantial concerns regarding program integrity, the award process, programmatic fraud, waste, and abuse, and misalignment with the Agency's priorities, which collectively undermine the fundamental goals and statutory objectives of the award." *Id*. EPA's Termination Notice does not identify any legal or factual basis for terminating the grant on these grounds.

95. The Termination Notice also states that EPA has identified certain deficiencies, such as "the absence of adequate oversight and account controls," "allocation of funds inconsistent with EPA's oversight and fiscal responsibilities," and the "circumvention and defeat of key oversight mechanisms." *Id*. EPA's Termination Notice does not substantiate these concerns or identify any legal or factual basis for terminating the grant on these grounds.

96. Regarding oversight, EPA sent an information request to OFN so that EPA could evaluate the GGRF program's oversight controls, giving OFN and other grantees until March 28, 2025, to respond. EPA terminated the Grant Agreement weeks before that response deadline. Nonetheless, OFN timely replied to those requests in full.

97. Finally, the Termination Notice asserts that EPA has "determined that its existing process for awarding and overseeing execution of the Grant Agreement" may violate the "Appointments Clause and private nondelegation doctrine." Ex. 5, Termination Notice at 2. EPA's Notice does not explain any legal or factual basis for terminating the grant on these grounds. Indeed, neither the Appointments Clause nor the private nondelegation doctrine is implicated by this Grant Agreement.

98. EPA has failed to substantiate the basis for terminating OFN's Grant Agreement despite repeated requests to do so, including from federal courts. "[W]hen questioned at the [March 12, 2025] hearing" in *Climate United Fund v. Citibank N.A.*, No. 25-cv-698, EPA could not offer evidence to justify its termination, instead offering "circular" responses. TRO Memorandum Opinion at 14. EPA was also directed to submit a declaration setting forth the basis for the termination of GGRF grants, but that declaration did not justify EPA's actions, offering only "vague and unsubstantiated assertions" without evidence. *Id.* at 22.

99. Despite its refusal to release grant funds, Acting Deputy Director of the Office of the Greenhouse Gas Reduction Fund Aileen Nowlan informed OFN on March 24, 2025, that "OGGRF does expect OFN to continue meeting the obligations under the Grant Agreement" and, incredibly, that it has "no information about the accessibility of funds."

**J. The Grant Agreement Does Not Allow Termination for Changes to Agency Policy Priorities.**

100. "The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." 2 C.F.R. § 200.340(b). The Grant Agreement does not permit termination simply because EPA has changed its policy priorities. Instead, consistent with OMB-issued, and EPA-adopted grant regulations, termination must take place "*pursuant to the terms and conditions of the Federal award*, including to the extent

authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4) (emphasis added).

101. Under the August NOA and the December NOA, termination for inconsistency with newfound agency policy priorities is not a basis for termination. Accordingly, at no point was OFN's award subject to termination on this basis.

102. The August NOA states that "Notwithstanding the General Term and Condition 'Termination,' EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 applicable to EPA grants as of July 1, 2024, pursuant to 89 FR 55262 (July 3, 2024)." Ex. 2, August NOA at 41-42. This refers to the revised version of 2 C.F.R. § 200.340, which went into effect on October 1, 2024, unless agencies adopted the revised regulation earlier. EPA adopted this revised regulation on July 3, 2024. *See* Applicability Date for the Office of Management and Budget's Regulatory Revisions, 89 Fed. Reg. 55,262 (July 3, 2024).[31]

103. The December NOA does not permit termination for changes in policy priorities. It states: "EPA maintains the right to terminate the Assistance Agreement only as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024." Ex. 3, December NOA at 43. This is substantively identical to the language in the August NOA.

104. Without its grant funding, OFN cannot carry out its mission and CCIA grant obligations, which are to deploy capital to vetted community lenders to fund green projects that would not otherwise have been able to obtain financing through traditional channels.

---

[31] Any allegation that EPA preemptively limited its ability to terminate grant awards in response to the November 2024 Presidential Election would be both immaterial and misplaced: EPA adopted the governing regulation limiting the grounds for termination in July of 2024.

105. At every turn, OFN relied on EPA to meet its obligations under the Grant Agreement and applicable law. Its expectation that EPA would perform its obligation was predicated on the plain terms of the Grant Agreement itself, supported by its reasonable belief that, when the government makes a promise, it keeps it.

## CLAIMS FOR RELIEF

### COUNT I
### BREACH OF THE GRANT AGREEMENT

106. OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

107. The Grant Agreement is a valid written agreement between EPA and OFN.

108. The Grant Agreement was executed or ratified by EPA representatives who had express or implied actual authority to bind the United States.

109. The Grant Agreement was entered into with mutual assent and was supported by consideration.

a. EPA awarded OFN $2,290,000,000.00 in grant funds and agreed to "cost-share 100.00% of all approved budget period costs incurred, up to and not exceeding total federal funding of $2,290,000,000.00." Ex. 3, December NOA at 1.

b. In exchange, OFN agreed to provide funding and technical assistance to community lenders working in low-income and disadvantaged communities, and agreed to meet the numerous obligations, responsibilities, and conditions EPA imposed on OFN. *See* Ex. 3, December NOA. Further, in reliance on the transfer of title of the funds to OFN, OFN made changes to its financial statements, including adding certain encumbrances while maintaining the minimum financial standards for CDFIs. *See, e.g.*, 12 C.F.R. §§ 1808.612–.613. Those encumbrances are

challenging to unwind while continuing to meet minimum financial standards for CDFIs.

110. OFN satisfied and complied with its obligations and conditions under the Grant Agreement.

111. Beginning in February 2025, in violation of the Grant Agreement, EPA took steps to block OFN's access to the funds it awarded to OFN. As a result of EPA's contractual breaches, OFN has been unable to access the funds it is contractually entitled to since February 2025. EPA's breach also deprived OFN of its contractual right to keep its grant funds following the Period of Performance.

112. Then, on March 11, 2025, EPA terminated the Agreement by issuing a Termination Notice. EPA's termination also breached the Grant Agreement because EPA had no legal or factual basis to terminate the grant under the terms of the Grant Agreement.

113. The Grant Agreement allows EPA to terminate "***only*** as specified in 2 CFR 200.339 and the version of 2 CFR 200.340 effective as of October 1, 2024." Ex. 3, December NOA at 43. These regulations require that "The Federal agency or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."

114. Furthermore, the Grant Agreement only permits termination if one of three conditions is met: (1) noncompliance with the grant's Terms and Conditions; (2) "adequate evidence of Waste, Fraud, or Abuse," which in turn requires "credible evidence of the commission of a violation of Federal criminal law involving fraud, conflict of interest, bribery, or gratuity violations found in Title 18 of the United States Code or a violation of the civil False Claims Act"; and (3) "material misrepresentation of eligibility status." Ex. 3, December NOA at 14, 43. None

of those circumstances occurred here. In fact, EPA concedes it "did not terminate for Plaintiffs' noncompliance" or any other "conduct" by OFN.

115. The Termination Notice confirms none of these grounds existed. It contains nothing specific to OFN's performance under the grant. Instead, every NCIF and CCIA grant recipient received materially identical Notices of Termination, confirming termination had nothing to do with OFN.

116. EPA has no independent authority to cancel the Grant Agreement, except as provided for under the terms of the Grant Agreement itself.

117. EPA's breach has stopped OFN from carrying out its work under the CCIA program. It has put a halt to core programming, prevented OFN from issuing subawards, and stripped the funding that supports nearly half of OFN's staff. EPA's breach cuts to the core of OFN's mission, jeopardizing its operations.

118. As a direct and proximate result of EPA's material breach of the Grant Agreement, OFN has suffered monetary damages in excess of billions of dollars. These damages include the value of the grant award less any grant funds already expended prior to EPA's breach, together with losses actually sustained as a result of EPA's breach, reliance damages, interest, costs of suit, and such other relief as this Court deems just and proper.

**COUNT II**
**BREACH OF THE ACCOUNT CONTROL AGREEMENT**

119. OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

120. OFN entered into a valid written ACA with EPA.

121. The ACA was executed or ratified by representatives of EPA who had express or implied actual authority to bind the United States, and was entered into with mutual assent and consideration by all parties.

122. The ACA restricts EPA's ability to claw back OFN's funds. The ACA provides that EPA may only exercise control over the accounts as a Secured Party if EPA issues a "Notice of Exclusive Control" stating that it "is exercising its right to exclusive control over an Account." Ex. 4, ACA at 2.

123. In particular, the ACA requires that Citibank must "comply with all instructions, notifications, and entitlement orders the Bank receives directing the disposition of funds and financial assets," *id*., and it requires OFN's funds to be released at OFN's request, unless EPA—the "Secured Party" to the agreement—issues a Notice of Exclusive Control.

124. This contractual limitation on EPA's ability to claw back OFN's funds was a significant factor material to OFN's decision to enter into the ACA.

125. In material breach of the ACA, EPA caused Citibank to deny OFN's requests for funding without first issuing a Notice of Exclusive Control.

126. Moreover, on March 11, 2025, EPA terminated OFN's grant by delivering a Termination Notice. This is likewise a material breach of the ACA, which only permits EPA to exercise control over the account after issuing a Notice of Exclusive Control. By issuing the Termination Notice, EPA effectively and improperly exercised control over the account.

127. EPA's breach has stopped OFN from carrying out its work under the CCIA program. It has put a halt to core programming, prevented OFN from issuing subawards, and stripped the funding that supports nearly half of OFN's staff. EPA's breach cuts to the core of OFN's mission.

128. As a direct and proximate result of EPA's material breach of the ACA, OFN has suffered monetary damages in excess of billions of dollars. These damages include the value of the grant award, less any grant funds already expended prior to EPA's breach, together with losses actually sustained as a result of EPA's breach, reliance damages, interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT III
## BREACH OF IMPLIED-IN-FACT CONTRACT

129. OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

130. EPA knowingly and voluntarily entered into a valid implied-in-fact contract with OFN.

131. Following a competitive selection process, EPA selected OFN to receive a grant under the CCIA program, pursuant to which OFN would provide funding and technical assistance to community lenders working in low-income and disadvantaged communities across the United States.

132. The government shared with OFN an extensive Grant Agreement setting forth the terms and conditions of the award. The Grant Agreement was made or ratified by representatives of the government who had express or implied actual authority to bind the United States, and constituted a clear and unambiguous offer by the government.

133. OFN accepted EPA's offer by agreeing to undertake significant work to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies and to carry out other greenhouse gas emission reduction activities.

134. OFN also agreed to accept the obligations, responsibilities, and conditions EPA imposed on OFN under the Grant Agreement, 42 U.S.C. § 7434(a)(1), and the Uniform Grant Guidance regulations codified at 2 C.F.R. § 200 *et seq*.

135. Further, OFN took on significant obligations and subjected itself to new standards to which it was not previously bound. In turn, OFN's work benefited the government. OFN began to undertake significant efforts to meet its obligations under the Grant Agreement, consistent with Congress' intent when it enacted the Inflation Reduction Act. Specifically, OFN began selecting subrecipients for funding, building capacity among community lenders, and preparing to finance and deploy projects under the CCIA program.

136. OFN satisfied and complied with its obligations and conditions under the implied-in-fact contract.

137. The parties' conduct, performance, and statements confirm mutual intent to contract. After the government announced the award, parties entered the formal Grant Agreement and executed a binding Asset Control Agreement. The government disbursed the full value of the award to Citibank for OFN's exclusive use, taking that money from the Treasury. Then the parties began executing the Grant Agreement and ACA. For months, OFN sought and received distributions of its award from Citibank, and used that funding to support significant activities contemplated under its workplan. OFN completed regular reporting, and the government conducted regular oversight. Both parties were in regular communication about fulfilling the terms of the Grant Agreement. The government's intent to contract is clear from these actions.

138. EPA provided a real benefit to OFN by awarding the multi-billion-dollar grant and agreeing to cost-share 100% of the costs it incurred under the Grant Agreement.

139. OFN, in turn, provided a real benefit to EPA by agreeing to enable low-income and disadvantaged communities to deploy or benefit from zero-emission technologies, and to carry out other greenhouse gas emission reduction activities. Indeed, as one of only a small number of CCIA grant recipients, OFN's actions were central to the success of the overall CCIA program.

140. The government induced OFN to participate in the CCIA program by awarding the grant funds to OFN.

141. EPA materially breached the implied-in-fact contract by causing Citibank to deny OFN's distribution requests for allowable costs under the Grant Agreement.

142. EPA also materially breached the implied-in-fact contract by issuing a Termination Notice without any legal or factual basis to do so, withholding the funds that OFN is entitled to under the implied-in-fact contract.

143. As a direct and proximate result of EPA's material breach of the ACA, OFN has suffered monetary damages in excess of billions of dollars. These damages include the value of the grant award, less any grant funds already expended prior to EPA's breach, together with losses actually sustained as a result of EPA's breach, reliance damages, interest, costs of suit, and such other relief as this Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

144. OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

145. A covenant of good faith and fair dealing is implied in every contract, express or implied-in-fact, and it imposes obligations on both contracting parties. These obligations include the duty not to interfere with the other party's performance and not to act so as to destroy the reasonable expectations of the other party regarding the fruits of the contract.

146. The express and the implied-in-fact contracts entered into between the United States and OFN implicate this covenant. Specifically, OFN had a reasonable expectation that its requests for costs incurred would be timely and fully honored. This expectation is central to the consideration for the contract.

147. By terminating the Grant Agreement and failing to ensure that OFN received the funds it was promised, EPA has destroyed OFN's reasonable expectations regarding the fruits of the express and implied-in-fact contracts. That action breaches the implied covenant of good faith and fair dealing.

148. EPA breached the implied covenant of good faith and fair dealing by, among other things, terminating the Grant Agreement, without warning, despite OFN performing its obligations under the Grant Agreement, and after OFN had undertaken significant efforts to meet its obligations under the Grant Agreement, notwithstanding the government's clear obligation to honor its commitment to make grant funding available for OFN.

149. EPA further breached the covenant of good faith and fair dealing by refusing to give OFN an opportunity to cure any purported noncompliance of the Grant Agreement and by refusing to respond to OFN's inquiries about and efforts to resolve EPA's purported performance concerns.

150. EPA's breach has stopped OFN from carrying out its work under the CCIA program. It has put a halt to core programming, prevented OFN from issuing subawards, and stripped the funding that supports nearly half of OFN's staff. EPA's breach cuts to the core of OFN's mission.

151. As a direct and proximate result of EPA's breach of the implied covenant of good faith and fair dealing, OFN has been irreparably harmed and suffered billions of dollars in financial harm.

**COUNT V**
**TAKING WITHOUT JUST COMPENSATION**

152. OFN repeats and incorporates herein by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

153. EPA's actions complained of herein constitute a deprivation and taking of OFN's property for public use without just compensation, in violation of the Fifth Amendment to the U.S. Constitution.

154. OFN has a vested property interest in the grant funds that were disbursed by EPA and deposited into an account at Citibank for OFN's exclusive use. OFN had a reasonable expectation of receiving the full amount of grant funds in a timely manner, based on the Grant Agreement, the ACA, the implied-in-fact contracts with EPA, 42 U.S.C. § 7434(a).

155. EPA expressly and deliberately interfered with and has deprived OFN of its property interest in the grant funds and its reasonable expectation to timely receive the full amount of the grant funds.

156. On March 11, 2025, EPA terminated OFN's CCIA grant. EPA submitted a Termination Notice to OFN which contained no information specific to OFN's performance under the Grant Agreement and was materially identical to the termination notices sent to every other CCIA and NCIF grantee.

157. Since that date, OFN has not received access to any of its CCIA grant funds that are being held at Citibank exclusively for OFN's use.

158. This withholding of the grant funds, with no legitimate or lawful purpose as defined under the Grant Agreement or its implementing regulations, constitutes a deprivation and taking of OFN's property interests and requires payment of just compensation under the Fifth Amendment of the U.S. Constitution.

159. OFN is entitled to receive just compensation for the United States' taking of its property in the amount of the grant award, less any grant funds already expended prior to EPA's taking, together with interest, costs of suit, and such other relief as this Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, OFN respectfully asks this Court to:

1. Award Plaintiff monetary relief totaling the full amount of the grant, plus interest in the Citibank account, minus amounts already received by OFN, subject to proof at trial, to which OFN is entitled under the Grant Agreement, the ACA, 42 U.S.C. § 7434(a)(1), and 2 C.F.R. § 200 *et seq.*;

2. Award pre-judgment and post-judgment interest at the maximum rate permitted under law;

3. Award such court costs, litigation expenses, and attorneys' fees as are available under law; and

4. Award such other and further relief as the Court deems just and proper.

Dated: September 8, 2026

Respectfully submitted:

*/s/ David B. Robbins*

Sati Harutyunyan
JENNER & BLOCK LLP
515 South Flower Street
Suite 3300
Los Angeles, CA 90071
Tel.: (213) 239-5100
Fax: (213) 239-5199
sharutyunyan@jenner.com

David B. Robbins
*Counsel of Record*
Adam G. Unikowsky
Tanner J. Lockhead
Sierra A. Paskins
JENNER & BLOCK LLP
1099 New York Avenue NW
Suite 900
Washington, D.C. 20001
Tel.: (202) 639-6000
Fax: (202) 639-6066
drobbins@jenner.com

*Attorneys for Plaintiff*
*Opportunity Finance Network*